**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

IN RE

MERCURY DATA SYSTEMS, INC.                                      CASE NO. 18-50183

DEBTOR

**MEMORANDUM OPINION
AND ORDER**

This matter is before the Court on the following: (1) Debtor's Emergency Motion to Alter, Amend, or Vacate Agreed Order and Shorten Notice of Hearing [ECF No. 14 ("Motion to Vacate Agreed Order")]; (2) Debtor's Notice and Motion for Conversion to Chapter 11 and Request for Shortened and Limited Notice of Hearing [ECF No. 15 ("Motion to Convert")]; and (3) Debtor's Emergency Motion to Set Aside Order for Relief and/or Dismiss Case for Bad Faith, to Conduct Discovery and to Shorten Notice of Hearing [ECF No. 21 ("Motion to Dismiss")].

Debtor, Mercury Data Systems, Inc. ("Mercury"), was the subject of an involuntary chapter 7 bankruptcy petition filed in early February 2017. Mercury seeks to set aside the Order for Relief entered a month later and dismiss the chapter 7 bankruptcy based on the bad faith of the petitioning creditors and a failure to satisfy the statutory requirements of 11 U.S.C. § 303.[1] In the alternative, Mercury seeks conversion to chapter 11. Mercury also moves to vacate the Agreed Order Regarding Review of Debtor's Software, which authorizes review of Mercury's primary asset, its software source code [ECF No. 13 (the "Agreed Order to Review Software")].

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

Petitioning Creditors (hereafter defined) object and argue Mercury should remain in chapter 7 under the direction of Mark Miller, the Chapter 7 Trustee.

An evidentiary hearing was held on May 24, 25, and 30, 2017. For the reasons stated herein, Mercury's Motion to Dismiss and Motion to Convert are denied. Mercury's Motion to Vacate Agreed Order is granted to allow the parties to consider the substantial additional information available.

**I. FACTS.**

**A. Mercury Data Systems.**

Mercury is a software company attempting to develop high accuracy navigation technology. John Taylor is the sole owner and President of Mercury.

Mercury is developing a system for a non-GPS location device called TrakPoint. According to a preliminary business plan created by Taylor to solicit investors, Mercury began developing the current version of the TrakPoint system in 2013 after reaching a performance threshold of 99% accuracy 99% of the time. [Exh. 3, ECF No. 63-3.] Mercury represented that it planned to release the TrakPoint system in 2016 and the technology was so advanced that the Army expressed interest in awarding procurement contracts even before full development of the product. [*Id.*] Taylor represented that he anticipated completing the TrakPoint development by July 2018. [*Id.*] The preliminary business plan also claimed Mercury would meet certain milestones in 2016, including completing a market analysis, acquiring 5 patents, and acquiring exclusive licensing rights to three different algorithms. [*Id.* at 10.] Mercury met few of the milestones in 2016 or otherwise, and did not obtain a procurement contract either.

On April 29, 2016, Mercury entered a Note Purchase Agreement with several investors, including Quantum IT Global Holdings Pty Ltd. ("Quantum") and PSP Services Pty Limited

("PSP"). The financing provided $700,000.00 for continuation of research and development on the TrakPoint system and other software. [Exh. 19, ECF No. 68-1.] Mark O'Reilly ("O'Reilly"), owner of PSP and Head of Innovation at Quantum, signed the Note Purchase Agreement on behalf of the investors. The Note Purchase Agreement provided that Mercury would issue convertible promissory notes maturing in 18 months, on or about October 29, 2017. [*Id.*]

Mercury encountered financial problems despite the funds received from the investors. Taylor and O'Reilly testified that both knew Mercury was running out of money by March 2017. On March 30, 2017, Quantum agreed to provide additional funds pursuant to a document called Agreed Terms-MDS and A3 Funding ("Agreed Terms"). [Exh. 10, ECF No. 63-9.] O'Reilly signed the Agreed Terms on behalf of Quantum. O'Reilly had concerns about the investment, so Mercury agreed to develop an updated business plan by April 14 for "Plan B Funding" and provide Katherine Bennett, a certified public accountant hired by Mercury, full access to Mercury's financial records. [*Id.*]

Bennett was given the promised access, but Taylor did not prepare an updated business plan. Therefore, O'Reilly and Bennett worked on an updated business plan to facilitate solicitation of additional financing that the parties refer to as the "Live Plan." [*See* Exh. 34, ECF No. 72-12.] They completed the Live Plan in June 2017 and presented it to Taylor for review. [*See id.*]

In July 2017, Mercury ran out of money and stopped paying its debts. Alex Stuhl, described in testimony as a key player in TrakPoint's development, and another employee quit. Bennett continued to perform work for Mercury, including aiding O'Reilly with the Live Plan, but her invoices were not paid. [*See* Exh. 8, ECF No. 63-7 at 5-6.] Mercury's landlord

3

threatened a forcible detainer action, but has not acted. Taylor continued to work on the TrakPoint system, but his visits to the office to perform his managerial duties dwindled to the point that he appeared in the office only once or twice a month.

The loss of employees, potential for eviction, and approaching maturity of the convertible promissory notes caused significant concern for O'Reilly and Bennett. Taylor acknowledged the problems and agreed they had cause for worry. O'Reilly therefore arranged a meeting with Taylor and an Australian company called Codan Limited to discuss a technology partnership with Mercury that would bring in necessary capital and allow Taylor to focus on development issues. [Exh. 48, ECF No. 72-26 at 3.] Taylor expressed no interest in discussing a partnership with Codan. [*Id.* at 2.]

O'Reilly continued his attempts to find ways to fund development of the TrakPoint system and pay Mercury's creditors without success. Taylor rebuffed O'Reilly's efforts and took no action to find additional funding for Mercury or address Mercury's financial crisis. [*See* Exh. 51, ECF No. 72-29.] The relationship between O'Reilly and Taylor soured to the point that Taylor ceased communication with O'Reilly.

**B. The Involuntary Chapter 7 Petition.**

PSP, Peter King, and Bennett ("Petitioning Creditors") filed the involuntary chapter 7 petition against Mercury on February 7, 2018. Mercury did not respond, so the Order for Relief was entered on March 5, 2018. [ECF No. 4.] *See also* 11 U.S.C. § 303(h).

The Chapter 7 Trustee was appointed and took possession of Mercury's assets. This included changing the locks on the office and discussions with Mercury's employees. *See* 11 U.S.C. § 704(a). The Chapter 7 Trustee also obtained approval to allow Quantum to "review the quality and efficacy of the Debtor's software" through the Agreed Order to Review Software.

At some point in March, Taylor attempted to access Mercury's office. He discovered the locks were changed, so he could not enter the building. Taylor contacted Chris Creech, a Kentucky lawyer that assisted Mercury with certain transactional matters. Creech discovered the bankruptcy filing and Taylor caused Mercury to become active in this case.

On April 11, Mercury filed the Motion to Vacate Agreed Order and Motion to Convert. The Chapter 7 Trustee and Petitioning Creditors objected to both motions. [ECF Nos. 18, 19, 20.] On April 18, Mercury filed its Motion to Dismiss asking to set aside the Order for Relief under Federal Rule of Bankruptcy Procedure 9024 (incorporating Federal Rule of Civil Procedure 60).[2] [ECF No. 21.] Following a preliminary hearing on April 19, the matters were also set for an evidentiary hearing. [ECF No. 29.]

Petitioning Creditors then filed several amendments to the involuntary petition to add Stuhl [ECF No. 33], Qi Liu [ECF No. 36], Bruce Skeeter [ECF No. 37], Richard J. Tobiano [ECF No. 40], and Edward Kaleel [ECF No. 41] as additional petitioning creditors. Liu and Skeeter are employees of Mercury who are owed outstanding wages. Tobiano and Kaleel invested in Mercury. Also, Mercury supplemented the record with evidence of its ability to operate upon conversion to Chapter 11. [*See* ECF No. 57.]

Taylor, O'Reilly, and Bennett testified at the evidentiary hearing regarding their involvement with the company and the financial crisis. Creech, Skeeter, and Liu also testified about their work for Mercury. The parties filed numerous proposed exhibits before the evidentiary hearing and the following are admitted without objection: Exhibits 2-5, 8-10, 12-14,

---

[2] References to the Federal Rules of Civil Procedure will appear as "Civil Rule ___," and reference to the Federal Rules of Bankruptcy Procedure will appear as "Bankruptcy Rule ____."

16-19, 21, 26, 30, 32, 34, 36-39, 42-46, 48-53, 59, and 63-67.[3]  Mercury and/or Petitioning Creditors moved to admit the following Exhibits, but admission was denied for the reasons stated on the record:  Exhibits 7, 22, 31, and 35.  The remaining Exhibits are not admitted.

## II. DISCUSSION.

### A. The Request to Set Aside the Order for Relief and Dismiss the Case is Denied.

Mercury moves to set aside the Order for Relief and dismiss this case based on problems with the involuntary petition.  Mercury alleges PSP, through O'Reilly, joined as a Petitioning Creditor in bad faith, and there is a bona fide dispute as to Bennett's claim.  Mercury argued in its papers and at the evidentiary hearing that these defenses arise out of § 303 and it is entitled to an award of fees, costs and damages pursuant to § 303(i).

Arguments of bad faith and the validity of a petitioning creditor's claim are ripe during the 21-day answer period allowed for objections to the involuntary petition.  *See* 11 U.S.C. § 303(d); FED. R. BANKR. P. 1011(a) and (b).  These issues were effectively decided in favor of Petitioning Creditors upon entry of the Order for Relief.  "An adjudication, and concomitantly an order for relief, is … a conclusive determination of the debtor's status in bankruptcy, and *res judicata* between the actual parties to the proceeding to all the facts and subsidiary questions of law on which it is based."  *Mason v. Integrity Ins. Co.* (*In re Mason*), 709 F.2d 1313, 1315 (9th Cir. 1983).

Therefore, Mercury must satisfy its burden of proof to set aside the Order for Relief pursuant to Civil Rule 60(b) before its § 303 arguments are considered.  Mercury has not, however, presented sufficient grounds to set aside the Order for Relief.

---

[3] The exhibits are located in the record as follows: (1) Exhibits 1-18 [ECF No. 63 and 64]; (2) Exhibits 19-22 [ECF No. 68]; (3) Exhibits 23-63 [ECF No. 72]; (4) Exhibit 64 [ECF No. 73]; and (5) Exhibits 65-67 [ECF No. 82].

1. **The Involuntary Petition Satisfies § 303(b) and Mercury Received Proper Notice of the Petition.**

An involuntary case is commenced

> by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to the liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,775.00 more than the value of any lien on such property of the debtor securing such claims held by the holders of such claims.

11 U.S.C. § 303(b)(1).

Petitioning creditors must serve the involuntary petition on a debtor in the manner provided for service of a summons and complaint by Bankruptcy Rule 7004(a) or (b). FED. R. BANKR. P. 1010(a). An involuntary debtor may then contest the involuntary petition within 21 days after service of the summons. 11 U.S.C. § 303(d); FED. R. BANKR. P. 1011(a) and (b). "If the petition is not timely controverted, the court shall order relief against the debtor … ." 11 U.S.C. § 303(h).

Petitioning Creditors properly commenced this chapter 7 case by filing a petition asserting they have non-contingent, undisputed claims exceeding $15,775.00. Petitioning Creditors served the involuntary summons on Mercury Data Systems, ATTN: John Essex Taylor, Registered Agent, at two different Lexington addresses on February 8, 2018. [ECF Nos. 2 and 3.] Mercury did not contest service of process and service satisfies the Bankruptcy Rules. FED. R. BANKR. P. 1010(a), 7004(b). The 21-day answer period ended March 1, 2018, and Mercury did not timely respond to the involuntary petition. 11 U.S.C. § 303(d); FED. R. BANKR. P. 1011(a), (b).

The failure to timely object to the involuntary petition thus required entry of the Order for Relief under § 303(h) and resolved all questions related to Mercury's status as a chapter 7 debtor.

7

*See Mason,* 709 F.2d at 1315. Therefore, any defenses that Mercury could have raised in defense of the involuntary petition pursuant to § 303 are only considered if the Order for Relief is set aside.

### 2. Mercury Did Not Prove the Requirements for Civil Rule 60(b)(2) Relief.

Mercury initially argued Civil Rule 60(b)(2) warrants setting aside the Order for Relief. Civil Rule 60(b)(2) allows relief from an order if there is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." FED. R. CIV. P. 60(b)(2). "The movant needs to show by clear and convincing evidence (1) that it exercised due diligence to obtain the evidence and (2) that the evidence is material, *i.e.*, would have clearly resulted in a different outcome." *Luna v. Bell,* 887 F.3d 290, 294 (6th Cir. 2018).

When pressed to point out the required new evidence, and due diligence in its discovery, Mercury's counsel conceded Civil Rule 60(b)(2) does not apply on these facts. The evidence confirms Mercury knew of the existence of the facts supporting the alleged bad faith and claim dispute at least as early as October 2017 and did not act with diligence. The discussion of the proof related to Civil Rule 60(b)(6) herein verifies Mercury's concession and this conclusion.

### 3. Mercury Did not Prove the Requirements for Civil Rule 60(b)(6) Relief.

Mercury argues that O'Reilly participated as a petitioning creditor in bad faith and Bennett does not have a claim, both of which justify relief under Civil Rule 60(b)(6). Civil Rule 60(b)(6) permits a court to grant relief from a final judgment or order "for any other reason that justifies relief." FED. R. CIV. P. 60(b)(6). The subsections of Civil Rule 60(b) are mutually exclusive, so relief under Civil Rule 60(b)(6) is rarely granted. *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 393, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993).

To prevail under Civil Rule 60(b)(6), Mercury must present clear and convincing evidence of "exceptional or extraordinary circumstances" that justify setting aside the Order for Relief. *Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001). *See also Travelers Cas. & Sur. Co. of Am. v. J.O.A. Const. Co.*, 479 F. App'x 684, 693 (6th Cir. 2012) (clear and convincing evidence is required). Similar to Civil Rule 60(b)(2), the proof must also show the movant is "faultless" in the delay. *Pioneer*, 507 U.S. at 393; *In re Schulze*, 560 B.R. 305, 308 (Bankr. E.D. Mich. 2016). A movant cannot use Civil Rule 60(b) to re-litigate issues a movant should have raised during litigation. *See Walker v. WBKO Television*, 28 F. App'x. 472, 474 (6th Cir. 2002); *McNeil v. United States*, 113 F. App'x. 95, 97–98 (6th Cir. 2004). Further, relief under Civil Rule 60(b)(6) is only appropriate where principals of equity mandate relief. *McCurry v. Adventist Health Sys./Sunbelt, Inc.*, 298 F.3d 548, 592 (6th Cir. 2002).

The arguments under Civil Rule 60(b)(6) are not the same as a § 303 defense. Mercury argues that O'Reilly, acting on behalf of PSP, joined in the involuntary petition only as a means to obtain the TrakPoint source code. Proving an involuntary petition was filed in bad faith under § 303 by a preponderance of the evidence generally supports dismissal for an improper purpose. *See Adell v. John Richards Homes Bldg. Co., L.L.C. (In re John Richards Homes Bldg. Co., L.L.C.)*, 439 F.3d 248, 254-255 (6th Cir. 2006); *see also infra* Part II.B. Mercury's assertion that Bennett did not have a claim might also provide a legitimate defense under § 303(b)(1) because

9

three petitioning creditors with undisputed, non-contingent claims must initiate the involuntary petition.[4]

But the proof required to set aside an order is clear and convincing evidence of exceptional or extraordinary circumstances. Also, the equities must weigh in favor of Mercury. Mercury has not satisfied its burden because Taylor knew of the issues with O'Reilly and Bennett at least as early as October 2017. Further, Taylor did not act diligently after the involuntary petition was filed, so Mercury is not entitled to equitable relief.

### i. Taylor Knew of the Alleged Bad Faith and Potential Objections to Bennett's Claim in 2017.

Taylor initially suspected O'Reilly was not acting in Mercury's best interest when he found out about the Live Plan in July 2017. Taylor refused to draft the plan, as promised in the Agreed Terms with Quantum. Taylor also testified that he did not direct O'Reilly to draft the Live Plan, did not authorize Bennett to help, and did not agree with the plan's contents when he reviewed it.

Taylor believed his suspicion that O'Reilly was acting in his own self-interest, or that of the entities he represented, was confirmed when O'Reilly aggressively pushed to create sources of revenue for Mercury before the convertible notes came due. Despite Mercury's financial problems, Taylor believed that the proposals presented by O'Reilly and Codan in late September were only motivated by a desire to obtain Mercury's source codes for little or no compensation. Taylor went so far as to cease all communication with O'Reilly in late 2017.

---

[4] The record reflects five additional petitioning creditors have joined in the involuntary petition. Petitioning Creditors argue that the additional petitioning creditors cure any defects with Bennett's claim. The resolution of this issue is not necessary because Mercury has failed to present sufficient evidence to set aside the Order for Relief.

The evidence clearly shows Taylor knew about O'Reilly's alleged bad faith at least by October 2017. Taylor also found out about the alleged problems with Bennett's claims at the same time. Taylor testified that he learned Bennett exceeded the limits of her engagement in early October 2017 when he asked for and received copies of her invoices. [*See* Exh. 8, ECF No. 63-7.] Despite his knowledge of the problem, Bennett testified that Taylor never raised any issues with her invoices or directed her to cease communications with O'Reilly.

Taylor's prior knowledge prevents any conclusion that Mercury was faultless in the failure to raise the bad faith argument or claim dispute before entry of the Order for Relief. Taylor attempted to provide excuses for his delay, but the excuses do not justify equitable relief.

### ii. Taylor Abandoned Mercury and Does Not Deserve Equitable Relief.

Mercury did not act with reasonable diligence to timely raise the disputed issues due to Taylor's own lack of attention and negligence. Taylor testified he did not know of the involuntary bankruptcy until he attempted to access Mercury's facility and discovered the locks were changed. The Chapter 7 Trustee was not appointed until after the Order for Relief, so Taylor was at least absent from the business premises from February 7 through March 5.

The evidence confirms Taylor began ignoring Mercury's financial needs at least by Spring 2017. Taylor agreed in April 2017 to clean up Mercury's financials and prepare the updated business plan pursuant to the Agreed Terms with Quantum. [Exh. 10, ECF No. 63-9.] O'Reilly testified, however, that Taylor told him he had to work on development of the TrakPoint system. So Taylor directed him to work with Bennett on the Live Plan. Bennett also testified that Taylor was always "too busy" when he was asked to work on Live Plan.

Taylor completely abrogated his fiduciary duty to deal with the financial needs of Mercury in July 2017, when all parties agree Mercury ran out of money. Skeeter testified that

Taylor's attendance at the office dwindled after Mercury stopped paying its bills in July, to the point Taylor only appeared once or twice a month. Incoming mail piled up as Taylor did not delegate something as simple as opening the mail on a daily basis. The evidence shows that Taylor continued to work on the TrakPoint system, but he checked out of the business operations of Mercury in mid-2017.

Taylor attempted to excuse his absence around the time of the filing of the involuntary petition by explaining he suffered from the flu for three weeks. If Taylor was truly that sick, he should have appointed an employee to review Mercury's mail as part of his responsibility as a fiduciary. But the evidence confirms Taylor was not dealing with the mail by the time he had the flu anyway. Also, the evidence shows Taylor worked remotely during the period he claims to have had the flu. [Exh. 17, ECF No. 63-16.] Taylor's assertion he could not get to the office for an additional two-week period because his car had a dead battery lacks any credibility.

Taylor's lack of attention to the business affairs of Mercury does not show due diligence from the President and sole owner of a financially troubled entity. Mercury had a pre-existing obligation to raise the issues it claims as support for a Civil Rule 60(b)(6) action through a well-established procedure for involuntary proceedings created by the Bankruptcy Code and rules of procedure. This did not occur through Taylor's own inadvertence and negligence, so Mercury is not entitled to equitable relief.

The request to set aside the Order for Relief based on Civil Rule 60(b)(6) is denied. The conversion analysis herein also supports this conclusion. *See infra* Part II.C.

**B.   The Request to Dismiss Under § 707(a) is Denied.**

Mercury argues that it may still seek dismissal for bad faith under § 707(a), even if it may not pursue the bad faith claims under § 303. Section 707(a) provides, "The court may dismiss a

case under [chapter 7] only after notice and hearing and only for cause … ."  11 U.S.C. § 707(a). The party seeking dismissal under § 707(a) bears the burden of establishing cause.  *See Sicherman v. Cohara (In re Cohara)*, 324 B.R. 24, 278-28 (B.A.P. 6th Cir. 2005).  The decision to dismiss is an equitable determination and within the bankruptcy court's discretion.  *Id.*

Mercury may not use § 707(a) to present evidence it should have made in a contested hearing under § 303.  This would circumvent the explicit requirements of the Bankruptcy Code and Rules, making the conditions of § 303, Bankruptcy Rule 1011(a) and (b), and Civil Rule 60(b) meaningless.  *See generally DEF Investments,* 186 B.R. 671, 681 (Bankr. D. Minn. 1995) (refusing to allow a "second bite at the apple" in a Civil Rule 60 action).

Mercury conceded the evidence of bad faith for cause under § 707(a) is identical to the bad faith defense in § 303.  But Mercury suggests two cases support its right to pursue dismissal under § 707(a).  *See In re Forever Green Athletic Fields, Inc.,* 804 F.3d 328 (3d Cir. 2015); *In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y 2016), *aff'd*, 565 B.R. 427 (S.D.N.Y. 2017).  These cases do not help because they do not involve a second chance to argue bad faith.

*Forever Green* supports dismissal of an involuntary petition on bad faith grounds, but the court performed the bad faith analysis under § 303.  The debtor's failure to timely contest the involuntary petition was not an issue.

In *Murray*, the debtor sought a bad faith dismissal based on § 707(a) after the sole creditor filed the petition.  The debtor did not dispute compliance with § 303, but argued the filing was a litigation tactic.  The bankruptcy court held that a bankruptcy case is always subject to dismissal, even after the order for relief.  *Murray*, 543 B.R. at 490.  But this was the first time the bankruptcy court addressed proof of bad faith and there was no showing that the debtor had failed to timely controvert the involuntary case under § 303.  *Id.* at 497.

Only one other case was located that involved a dismissal for bad faith after entry of an order for relief. *See Fisher v. Bank Leumi Trust Co. of New York (In re MacFarlane Webster Associates)*, 121 B.R. 694 (Bankr. S.D.N.Y. 1990). The bankruptcy court in *Fisher* determined that bad faith is grounds for dismissal and the debtor had not raised a bad faith defense under § 303. *Id.* at 700. The case does not help Mercury, however, because a non-petitioning creditor moved for the relief in *Fisher*. The bankruptcy court determined non-petitioning creditors should have the right to move for dismissal under § 707(a) because they cannot contest an involuntary petition under § 303(d) and Bankruptcy Rule 1011. *Id.* at 700-701.

Equity supports giving a non-petitioning creditor an opportunity to raise an argument that it could not raise prior to entry of an order for relief. An involuntary debtor that had ample opportunity to defend against an order for relief, but failed to act in a timely manner through its own fault, is not entitled to the same reprieve. Cause does not exist to dismiss this case under § 707(a).

**C. The Motion to Convert is Denied.**

Mercury seeks conversion to chapter 11 pursuant to § 706(a) as an alternative to setting aside the Order for Relief and dismissal. Section 706(a) provides:

> The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable.

The statute shows conversion from chapter 7 is generally in the debtor's discretion. But the right to convert is not absolute where cause may exist to convert or dismiss under the chapter to which the debtor seeks conversion or when denial of conversion would serve to prevent "an abuse of

14

process." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 372-75 (2007); *see also In re Miller*, 496 B.R. 469, 475-76 (Bankr. E.D. Tenn. 2013).

A debtor bears the burden of proof to show it has not previously converted, it is eligible for relief under § 109, and conversion will achieve a purpose permitted by the Bankruptcy Code. *Miller*, 496 B.R. at 477 (citing *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 757 (Bankr. D.S.C. 2007)). Mercury made this *prima facie* showing. The burden therefore shifts to Petitioning Creditors to prove conversion is not justified by a preponderance of the evidence. *Id.*

In deciding whether to allow conversion, courts consider factors such as:

(1) whether the debtor is seeking to convert in good faith;
(2) whether the debtor can propose a confirmable plan;
(3) the impact of denying conversion weighed against the prejudice to creditors caused by allowing conversion;
(4) the effect of conversion on the efficient administration of the bankruptcy estate; and
(5) whether conversion would further abuse the bankruptcy process.

*Id.* at 477. Petitioning Creditors have shown these factors weigh against conversion and Mercury's evidence does not contradict the presentation.

### 1. Taylor Has Consistently Ignored His Financial Obligations.

The preceding discussion confirms Taylor began abrogating his management responsibilities in early 2017. Taylor allowed O'Reilly and Bennett to take on management duties after signing the Agreed Terms with Quantum. Bennett had full access to Mercury's financial system, even having authority to pay her own invoices. Taylor thereafter cast blame on O'Reilly and Bennett for Mercury's problems, ignoring his primary responsibility.

For example, Taylor complained that O'Reilly pushed him to send product to Qatar and that increased Mercury's costs. But Taylor had the authority as the President of Mercury to refuse to do something he thought wasted resources. Taylor also said he determined Bennett

15

worked outside the scope of her employment in October 2017, and Bennett's January 2018 invoice confirms this conclusion. But the evidence shows Taylor made no attempt to call off Bennett, despite his belief she was acting beyond the scope of her duties.

Taylor also did nothing to address Mercury's cash needs. *See supra* Part II.A.3.ii. There is no evidence Taylor attempted to secure additional funds after Mercury ran out of money in July 2017. Instead, Taylor quit coming into the office on a regular basis and refused any attempts to find a new revenue source. Even if Taylor disagreed with O'Reilly's efforts, it is reasonable to expect the President and sole owner would do something to find additional resources to allow completion of the company's only viable product.

Liu testified that Taylor told the employees the money problems would solve themselves if they completed the TrakPoint system. This is a myopic and misguided view of the duties of the sole manager of an entity. The evidence overwhelmingly shows Taylor refused to manage the company or address Mercury's financial needs, critical components of a successful reorganization in chapter 11. Taylor is not equipped to manage a debtor in a chapter 11 reorganization proceeding.

### 2. The Failure to File Required Tax Returns Jeopardizes the Chances of a Successful Reorganization.

Taylor retained Bennett to prepare Mercury's 2016 tax returns, but she said that cannot occur until Mercury amends the 2015 tax returns. Bennett believes Mercury earned additional income in 2015 and more tax is due. Taylor testified that Bennett double counted 2014 income in the 2015 year. He said the mistake was obvious, but he could never persuade Bennett to change her view. Mercury did not present any evidence to support the alleged error.

Taylor's failure to resolve the conflict with Bennett confirms his inability to operate Mercury. It is not credible to believe Bennett would maintain her position if the necessary changes were so simple or accurate. The more likely conclusion is Taylor refused to engage with Bennett on this issue, just like he failed to address other financial matters facing the company.

The failure to file tax returns has implications affecting reorganization beyond the obvious feasibility concerns involving the cost to complete the returns and exposure to additional tax, interest and penalties. The typical package used to solicit investors includes completed tax returns. It is also possible, and maybe likely, that any federal government contract will not issue to an entity that has not filed its tax returns. The lack of current tax returns show Mercury's plans for operation in chapter 11 are unrealistic.

Mercury also failed to pay employee payroll taxes of at least $75,000.00. Ignoring a trust fund tax confirms Taylor's lack of financial sophistication and opens him up to liability that could interfere with his ability to manage Mercury in a chapter 11 proceeding. Taylor's failure to address Mercury's tax obligations emphasize why conversion is not appropriate.

**3.  Mercury's Projected Completion Date for the TrakPoint System is Not Realistic**.

The 2016 business plan promised completion of the TrakPoint system to the next readiness level by July 2018. [Exh. 3, ECF No. 63-3.] Taylor projects only a one month delay in completion, until August 2018, in his summary reorganization plan. [Exh. 1, ECF No. 63-1.] But Taylor's testimony confirmed Mercury realized very few of the promises and projections in the 2016 business plan and the cumulative evidence presented confirms the original estimate was overly optimistic.

Taylor also specifically identified the bankruptcy filing as a cause of the failure to meet the July 2018 completion deadline. The bankruptcy case is four months old, and Mercury missed an important April demonstration. These facts, and the failure of most of the 2016 predictions, mean Taylor's projection of only a one-month delay in completion of the TrakPoint system is unlikely.

**4. Mercury' Proposed Budget is Unrealistic**.

The TrakPoint system requires substantial work to take it to the next readiness level. Taylor presented some possible avenues to finance additional development [Exh. 1, ECF No. 63-1], but he admitted additional funding is only possible when the next stage of development is complete. Despite Taylor's testimony to the contrary, the evidence presented makes it more likely than not that Mercury needs at least one additional employee to bring the TrakPoint system to the next level.

Taylor tasked former employee Stuhl with designing hardware necessary to run tests for the TrakPoint system's development. Testimony from Skeeter and Liu credibly suggest a person with Stuhl's expertise is required. Taylor admitted that finding an employee with Stuhl's knowledge is difficult, which means it is not likely to happen in time to support Taylor's projections. [*See* Exh. 16, ECF No. 63-15, at 2.] Even if a person is found, the $23,190.00 remaining at the end of the 3-month budget leaves very little to support a salary for an additional employee, particularly since Mercury's budget does not address other necessary costs.

In addition to potential tax obligations, the proposed budget does not address reorganization costs. It is clear Taylor cannot adequately project financial needs and resources of a reorganized entity, but there is no fee for an accountant to assist with this task. The legal fees are inadequate to cover preparation of a disclosure statement and plan, so Mercury does not

contemplate proposing a plan in the next three months. Again, the funds remaining at the end of the budget period do not leave any room for additional, necessary costs.

### 5. Petitioning Creditors Have Satisfied Their Burden of Proof.

The cumulative evidence shows it is unlikely Mercury will complete TrakPoint's development to the next level by August 2018 or obtain additional funding. The funds remaining at the end of August do not leave room for error or delay, and are not sufficient to fund preparation of a reorganization plan. Petitioning Creditors have therefore shown that a successful reorganization is not feasible under the current circumstances pursuant to § 1129(a)(11) and Mercury cannot propose a confirmable plan.

It is also very apparent that Taylor is not equipped to manage a debtor in a chapter 11 proceeding. Taylor's claim of inattention for over a month due to the flu and a failed car battery highlight his inability to understand his responsibility as the leader of Mercury. Taylor believes in his product, but he has unrealistic expectations that prevent extending credibility to his estimated time lines and financial assertions.

Allowing Mercury to convert would further prejudice creditors, some of whom have gone unpaid since July 2017. Mercury has not offered sufficient evidence to counter Petitioning Creditor's evidence. The Motion to Convert is denied.

### D. The Motion to Alter the Agreed Order to Review Software is Granted.

The Chapter 7 Trustee and Petitioning Creditors entered into the Agreed Order to Review Software to allow Quantum to review Mercury's source codes. Mercury argues that O'Reilly's and Quantum's only goal is obtain the TrakPoint source code without compensating Mercury's estate. [ECF No. 14.] Petitioning Creditors supplemented the record with the Affidavits of

O'Reilly and Guthrie White, the CEO of Quantum, to provide additional support for the Agreed Order to Review Software. [ECF Nos. 52 and 53.]

The need for an order to permit inspection is not the usual course of action for a trustee, who liquidates assets in the ordinary course of duties. 11 U.S.C. § 704(a)(1). Normally, a trustee would enter into a confidentiality agreement in this situation to protect the integrity of the asset. Counsel for Petitioning Creditors stated that a confidentiality agreement was drafted and ready for execution. But the Chapter 7 Trustee explained at the May 24 hearing that he required an order because of the developing dispute between Mercury and Petitioning Creditors.

The course of the case has changed since entry of the Agreed Order to Review Software. Mercury and Taylor began to participate in the case and Petitioning Creditors filed the affidavits of O'Reilly and White in the record. Also, the three-day evidentiary hearing revealed substantial additional information that the Chapter 7 Trustee may need to consider before moving forward with any hardware or software review. Therefore, the Motion to Alter the Agreed Order is granted without prejudice to the right of any party to seek the same or similar relief.

### III. CONCLUSION.

Based on the foregoing, it is ORDERED that:

(1)     Debtor's Motion to Vacate Agreed Order [ECF No. 14] is GRANTED and the Agreed Order entered on April 6, 2018 [ECF No. 13] is VACATED;

(2)     Debtor's Motion to Convert [ECF No. 15] is DENIED; and

(3)     Debtor's Motion to Dismiss [ECF No. 21] is DENIED.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
Dated: Friday, June 08, 2018
(grs)